Good morning, Your Honors. May it please the Court. I'm Katie Kovacs for the United States. I'd like to save five minutes of my time for rebuttal, if I may. The District Court's award of more than $437,000 in attorneys' fees in this case far exceeds what can be considered reasonable under EJA. We've raised only three issues on appeal, all of which concern the application of the law to undisputed facts. First concerns enhanced fees, whether the District Court should have awarded fees in excess of EJA's statutory cap to individuals who had not developed a practice specialty in environmental law. Second concerns whether the District Court should have reduced the fee award based on NRDC's very limited degree of success in this case. And the third concerns whether the District Court erred in awarding fees incurred on appeal in contradiction to this Court's rules and precedent. And I'd like to address each of those issues in turn. First, the District Court abused its discretion by awarding fees above EJA's statutory cap to all of the members of NRDC's litigation team. In Pierce, the Supreme Court explained that EJA has a $125 cap, which adjusted for inflation is about $160, and that the Court can only award fees above that cap if the fee applicant shows a, quote, special factor. And to show a special factor, the applicant has to show three things, that the attorney has distinctive knowledge or specialized skill that's needful for the litigation and can't be obtained at the statutory rate. NRDC failed to meet its burden on all three of those. I'd like to focus for a moment on that last prong. How does one do that? I think it needs Particularly in the tight time framework that was involved in this particular litigation. How do you prove that you can't get somebody with expertise that fits within the statutory cap? This Court addressed that exact question in 22249 Dolorosa Street. The Court said that the applicant's burden is to show that no suitable counsel would have taken the case at the statutory rate. It's not sufficient for the applicant to simply allege in a declaration, for example, that market rates for similarly experienced attorneys also exceed the rate. And that's all that NRDC And I'm familiar with that case, but I still get back to the point. How do you do that? Well, I think at least you have to allege in a declaration that no other attorney who could have handled the case, was competent to handle the case, would have taken the case at the statutory rate. And on what would you base that? You would base that at least, in this situation, NRDC hasn't even begun to meet that standard. Well, the government, for example, talks about a 340 rate and something like that. How did you do that? How do you determine what the appropriate rate is? Well, I'd like to address that point there. They do submit declarations that talk about market rates for similarly experienced counsel. Under Dolorosa Street, that is not the point. Right. The point is whether there was anybody who would have taken this case at the statutory rate. I understand that. I understand your point, and you may absolutely be right about that. I'm simply saying that as a practical matter, in order to carry out the Supreme Court's instructions on this, how does somebody do that? I think at least the plaintiff needs to make an allegation and a declaration based on their experience in the ---- Do they have to call some people and say, we called ten people that have some experience, and they all said, are you kidding? I'm not going to do this for $150 an hour. Is that what you have to say? I'm not sure how much a plaintiff would ---- how much research a plaintiff would have to do. In this case, the Court doesn't need to answer that question. So I ---- You don't? In another ---- no, because in this case ---- Well, what I'm saying is at least they would have to say in their declaration that not just that we couldn't have found anybody who could have handled this case as well, which is what they do say in the declaration. What they have to say is that nobody who was competent to handle the case would have handled it at the statutory rate. And that's not something that they say in their declaration. So at least you need to make the allegation and declaration, which they didn't do here. They allege something different in this case. But I'd like to focus on the first element of the Pierce test, which is, as this Court has interpreted it, it requires the fee applicant to have developed a practice specialty. That's what this Court held in both Love and Pierce. And in Animal Lovers, the Court phrased it as the attorney there specialized in environmental work. Now, we don't dispute that Mr. Reynolds and Mr. Wetzler, in this case, certainly have developed a practice specialty in environmental law and satisfy this first element of the Pierce test. We don't dispute that. But NRDC has not met its burden of proving that the six other members of the litigation team had developed a practice specialty in environmental law. One wasn't even a member of the bar. One had passed the bar five months before. None of the attorneys at Arell and Manella were in the firm's environmental practice group. But does Richland Security Service have any relevance to the non-bar member? No. I filed a response to their 20HA yesterday that I hope the Court received. It's the very least equivalent to a paralegal, if nothing else, right? Well, I would say yes, exactly. That somebody who's not a member of the bar should be treated as a summer associate or a paralegal. My recollection is the district court awarded, I think, $100 an hour for summer associates. The government objects to that. No, no. We didn't raise that on appeal. We don't object to paralegal fees. What we object to here, I think Mr. Jasny wasn't a member of the bar. I believe the court reimbursed him at $220 an hour. The Supreme Court, in its decision earlier this week in Richland, didn't discuss enhanced fees. The fee application there was kept at $95. So Richland I don't think is relevant today at all. What is relevant is that the district court based the award of enhanced fees to these six individuals based solely on their experience litigating a motion to dismiss for lack of jurisdiction in one other case. Now, that standard is in conflict with circuit precedent, and it renders EJA's statutory cap virtually meaningless. First of all, as I said, in Love and Paris this court said that you have to have developed a practice specialty. In both of those cases the court noted that the attorneys had handled multiple cases, not just one and not just on a motion to dismiss. If that is the standard under the district court standard, who isn't entitled to enhanced fees? If you have all you need to do is handle a motion to dismiss for lack of jurisdiction, you don't even need to be a member of the bar. And you don't even need to have written the motion. You just do a little bit of research on a jurisdictional issue and suddenly you're entitled to enhanced fees under the district court's conception. That simply cannot be the case. Congress established a statutory cap. Taking your criteria, let's see if we can distinguish these things. On the one hand, you have the NRDC people that had written articles, had spoken and lectured and so on and so on. Are you contending that the NRDC portion of this team was not expert? There are four individuals at NRDC. Two of them, Mr. Reynolds and Mr. Wetzler, we don't contest. I understand. What about the other two? The other two, if you have, you might have, our position is that you at least have to be a member of the bar. One is not even a member of the bar. He can't have a, quote, practice specialty in an area of the law if he's not even allowed to practice law. And that's where you don't think Richland has anything to do with that. No. Well, Richland answered the question of what rate, of how you, do you, basically, do you reimburse the paralegal fees from the client's perspective or the attorney's perspective? Let's assume that the paralegal was an expert. Say we've got these people at NRDC. They've written articles. They've given talks on these very issues. So let's assume you treat them as experts. Experts sometimes have really, really high fees. And that would be? Could that not be what they're getting here? I mean, the court didn't articulate that. Well, that's not what NRDC asked for. NRDC did have an expert in this case. And we don't contest the award of their expert expenses. If they had wanted to treat Mr. Jasny as an expert, they might have attempted to do so. They didn't. They sought attorney fees for him. The district court identified him as an attorney and awarded him $220 an hour, which far exceeds. I mean, again, in Richland, the fee application for paralegals was kept at $95 an hour, which is way below the statutory cap. So the district court's conception here far exceeds what can possibly be considered reasonable under EJA. It conflicts with circuit precedent, and it renders the cap virtually meaningless. On the second point of the Pierce test, which is whether these skills and knowledge were needful, even if some specialized skill and distinct knowledge was required in this case, Andrew Wetzler and Joel Reynolds provided that expertise. NRDC did not meet their burden of showing that two experts in environmental law weren't enough, that they needed six more specialists in environmental law. In fact, they didn't even address this point in their brief on appeal. They do not contest on this point. On the second, if they do require expertise, they have it right here. You don't need eight environmental specialists on a case. They did not meet their burden on that point. Moving to the second issue we've raised on appeal, the district court abused its discretion in failing to reduce the fees here based on limited degree of success. NRDC realized the Supreme Court in Hensley called this the most critical factor in determining the reasonableness of the fee award, and yet the district court didn't even discuss it. What defines success under each of them? In this situation, what the court said in Hensley was the court needs to consider the relationship between the hours and the, quote, results obtained. Let's take that. I did a little chart for my own interest about what existed before and what happened afterwards, and it seemed to me that there were some very significant verification enhancements. The distance from Hawaii, I think, one before was 14 miles, and it became 25 miles. Why wasn't that successful? They achieved ‑‑ I admit that they achieved some success in this case. The court needs to look at that objectively based on what they originally asked for and what they ended up getting. Now, in the government ‑‑ You're saying what's in the complaint, that if you don't get what you asked for in the complaint, particularly when a matter is settled, that you're toast under AJA? In this situation, I would say that, yes, the court should look at what they asked for in the complaint. The case didn't ‑‑ in another case that proceeds for years and might have motions for summary judgment, there might be other things the court would look to. In this case, we look at a complaint. If you take that approach, though, wouldn't the entire environmental bar go out of business, in effect, because most of those cases are settled, and they come in with all kinds of claims, and they claim problems with all sorts of statutes like NEPA and so on and so on, and then there's a settlement, almost always. Yes, and yet what you allege at the beginning and what ultimately gets proved doesn't ever get very far. Your Honor, this amount, this award, is not normal. This is a very unusual ‑‑ What's a normal award for a settlement? Well, normally we can settle on attorney's fees, which is why we don't bring these kinds of appeals lightly. We don't bring these appeals often, because normally we can settle ‑‑ What do you think is a reasonable amount? In this case, we ask the court to reduce ‑‑ I think a reasonable reduction on this point for limited success would be 30%. That number is not related to anything in particular. What's the bottom line of the whole thing? The bottom line of the whole thing I laid out at the end of the blue brief, which is, I think, 182. The third point that we raised on appeal about appellate fees, I don't think there's need for much discussion on that point. The circuit rules clearly require an applicant to file the fee application in this court. Cummings addressed this exact question and held that the district court can't address appellate fees unless this court sends that issue back to the court. Did he say that? I mean, have we never had a case where, let's say, you have an interlocutory appeal or something, and the district court finally awards a fee at the end? Can't they take the whole package? They can't. Under Cummings, the court said very clearly that they can't, and the circuit rule is abundantly clear on this point. 20th Century Fox was just that kind of case, but the court did not address this issue. The issue was raised, but the court didn't discuss it. The court certainly didn't purport to overrule Cummings, which is a very clear holding of this court and binding, that you have to submit your fee application in this court, and then this court can remand the issue and often does if the fee applicant moves to have the fees remanded to the district court for resolution with all of the other fees. That is quite common, but the fee applicant has to move for the fees in this court. I don't think there can be really much dispute on that issue. That issue, getting back to your question about the bottom line, at the enhanced rates the district court awarded, that issue alone is worth more than $76,000. Well, if EJIA is, obviously that's a federal statute. If EJIA, under its wording that refers to a court or the court under 2412, wouldn't that override our rule if we construed that to mean that in this setting that the district court could award fees? Well, if you did that, you would be overruling Cummings, which, with all due respect, you don't have the authority to do. No, we're not on bond power. And if the statute is ambiguous, it says court, this court's rules make clear which court, at least in this circuit, which court that refers to. And I don't think all circuits require this. Do you think Cummings construed that question, whether or not the statute, whether EJIA, controlled over the circuit rule? I thought it just dealt with the application of the circuit rule. I think that you're right. I think it did discuss the circuit rule. But NRDC doesn't argue about the language of the statute in this case either. So the argument hasn't been presented. I would like to reserve time for rebuttal, but I did want to answer one of your earlier questions, Judge Smith, which was about the success in the settlement agreement. In the government's opening brief, I demonstrated why it is that the settlement agreement, by and large, memorialized mitigation measures that were already required. NRDC didn't respond to that in their brief. Instead, they propounded a theory about why the court shouldn't look at settlement agreements at all. But they did not disagree with my analysis of the settlement agreement. Just so I understand this clearly, what's the government's position as to how, you know, let's say we write an opinion in this case. How do we quantify, what is the test for determining success in a case where you allege, you know, 20 causes of action never gets really litigated? There's some discovery. People litigate it. And there's a settlement agreement. And maybe only two of the alleged causes of action really find their way into the settlement agreement. How do we measure whether that's successful? Using Your Honor's term, quantification, I'm not sure that quantification is appropriate. I think the Supreme Court's point is there is a bit of discretion in this arena. Basic problem here. But you think the district court abused its discretion. Well, the district court didn't exercise its discretion on this point at all. She didn't discuss this issue. She simply didn't exercise her discretion. If she had exercised her discretion, I do want to save time for rebuttal, but if she had exercised her discretion, she would have had to have found that what NRDC got, compared to anything, compared to what they asked for in the complaint, look at it from the Navy's perspective, look at it from anybody's perspective. Objectively, what NRDC got in this case was very limited. And I'd like to save the remainder of my time for rebuttal, if I may. Okay. Thank you. We'll hear from the NRDC. Good morning, Your Honors. May it please the Court, Joel Reynolds representing NRDC et al. I definitely want to get to this issue of success, but there are a couple threshold points if I could mention briefly at the outset. First, the standard of review is very deferential in a fee proceeding, and for good reason. One of the ironies of fee applications is that in opposing them, there's often a tendency toward amnesia about the underlying merits action, and that tendency, I believe, is very much at the heart of this appeal. But that's precisely why deference to the district court in determining the amount of a fee award has always been required from the U.S. Supreme Court on down. Second, it's clear that appellants see this case very differently than Judge Cooper did. But Judge Cooper was very clear in her opinion, and I quote, it is difficult to imagine how any other group of lawyers could have been brought up to speed on the complex factual and legal issues of this case starting from scratch and been able to successfully obtain a TRO and then reach a mutually beneficial settlement prior to the commencement of RIMPAC 2006. Now, do appellants disagree? Of course they disagree. That's what appellants do. But to call this litigation a, quote, run-of-the-mill APA case that required no specific expertise, as appellants do, invites disbelief when you consider the 17 lawyers that they assigned to this case in some capacity and the lengths they went to oppose plaintiffs' claims. They created a litigation emergency by delaying approval of the permit until the day after the challenge exercises had begun, which visualize this. That means the ships of eight nations are sitting idling in the waters outside Hawaii waiting to begin, and only at that point in time do they issue the permit. Then they opposed and lost the TRO application required by their delay, including for the first time ever invoking an exemption from protections of the Marine Mammal Protection Act. Now, visualize this. At noon on the eve of 4th of July weekend, they issued for the first time ever an exemption from the MMPA. Now, before the afternoon is out, we've had to file two more briefs addressing the implications of that. And then on July 3rd, in the middle of the 4th of July weekend, the judge issues her TRO. And then at that point, they file a lengthy motion for a stay pending appeal, and then an even more extensive appeal in this court, an emergency motion, asking to have the TRO overturned. All of this required plaintiffs' counsel to respond virtually immediately, before, during, and after the holiday weekend, while at the same time pursuant to court order, attempting to negotiate a settlement. Counsel, your figure is 17 attorneys. Was that 17 government attorneys involved in this? Yes. Is that in the record? Yes, it is. That is SCR 6. So fortunately, the district judge wrote a thorough and reasoned opinion based on her firsthand observation. So the third point I want to make, and I think it's very striking as I listen to my opposing counsel here, being a district judge is not a rote exercise. It's not like checking a box. And I think there's some language in a case cited by appellants that I was particularly taken with. It's in McGinnis v. Kentucky Fried Chicken, 51 F. 3rd, 805, 9th Circuit, 1994. Although the judge made no rote recitation of the factors governing the fee award, when ruling on the appropriate amount of fees, no rote recitation is necessary. His decision gives us no basis for doubting that he was familiar with controlling law. And I submit, Your Honors, that that is the test to be applied given the standard review and that Judge Cooper passed that test with flying colors. Now, let me address specifically the points on appeal. First, Judge Cooper found that plaintiff's counsel possessed special skills and distinctive knowledge needed for successful prosecution of this case. And she based this finding on precisely the kind of factors cited by the U.S. Supreme Court in Underwood and by this Court in Pierce. She considered, for example. Mr. Rumsfeld, can I interrupt you for just a second? Yes. It's very clear that there was a whole lot of work done. There was clearly a lot of expertise on the part of the NRDC and perhaps a partner at the other law firm. But I'm concerned a little bit about the IRL understudies, if I may say that. And I mean that with all due respect to them. It seems, based on the record, that their experience was in civil litigation, but without any particular reference to environmental work. How do we justify, not the partner, but the junior lawyers at IRL's fee at the higher fees based on expertise, at least in light of the case law from the Supreme Court? Yes. I think the Underwood case basically establishes the principle there are a number of factors that the district court can consider. And I think in this case Judge Cooper did that. And she followed very closely, in fact, what the Ninth Circuit did in Pierce. And that appears in ER 261 and 262 where she goes through the basis for her conclusion that there was special skill and distinctive knowledge in this case. And she does rely very heavily. In the abstract, I don't think there's any disagreement there. But I think Judge Smith's question, and it's my question as well, is what do we do with the junior attorneys? Well, I think, again, I would point to Judge Cooper's opinion. Because what she concluded, based on her firsthand experience, was that given the complexities of this case, the environmental claims, the technical complexities of sonar, mitigation impacts, that this group of lawyers, from Richard Kendall, the senior partner, through the associates who had been working on this prior case, had that unique expertise. How many of them had worked on the prior case? All of them. Mr. Heinrich? Yes. Mr. Thayer? Yes. Mr. Morgan? Yes. All of them had worked on it. At the time, however, that the TRO was issued, there really wasn't much in there about NEPA or the medium-frequency sonar, was there? It was more typical. No, it was absolutely at the heart of the case. Because in order to establish the basis upon which to get the TRO, we had to understand not only what the statute said, but how mid-frequency worked in terms of the dangers associated with this extraordinarily loud technology, which is more like a physical force, actually, than it is like a sound. We had to understand the impacts on the environment and marine species in order to overcome the government's claim that they had done an adequate environmental review and that their mitigation was sufficient to reduce any significant impact. Getting around, getting over, getting through those claims were essential in order to prevail at the TRO level. And then, once having the TRO, in order to understand under these enormous time pressures of this case how to settle it, what could we get under those circumstances that would reduce the risk associated with the use of this technology and yet enable the Navy to do what it needs to do in terms of training for our national security? We do not bring these cases in order to stop the Navy from doing what it needs to do. Our purpose in all these cases, and this one is included in the one that Judge Cooper relied on, is to ensure that they do what they need to do in a more environmentally responsible way. And the mitigation measures that we were able to extract, and I use that term specifically because, believe me, we met by telephone with the Navy the night before the permit was issued. Is that the standard, that they do things in a more environmentally sensitive way than they would have done without litigation? That's my word. Mitigation is necessary to reduce impact below a level of significance. And that's our goal, and that's ultimately what Judge Cooper found. How do you define, again, if you were writing an opinion about this, how do you define success? I mean, really, that has a lot to do with this case. The government contends that, you know, this is a lot of schturm und drang, but at the end of the day, there really wasn't all that much of a change, and all these people working, and it really didn't accomplish anything. How do you respond to that? Let me address that, because I think that's very important, and I have to say a little difficult to hear the government denigrated at this point, given how hard they fought it at the time. But there were a number of measures that were part of that settlement, which were not only very important in that particular exercise, but have become very important since that time in addressing other exercises. And I know, Judge Smith, that you're quite familiar with that. I'm familiar with the one off the California coast. Absolutely. So let me just go very quickly through a list of what the settlement accomplished. First of all, it increased visual monitoring, including requiring dedicated monitors that previously did not exist. If I could just interrupt you, only because I don't want to take from your time. I appreciate, like I said, I did myself a little four-page chart about the differences, and there were significant differences. What I'm hoping you can provide for me is a little more global analysis of what constitutes success in this setting. The government takes the position that you asked for all these things. You didn't get very many of those, at least based upon the face of the complaint. Yes, you got a settlement. But particularly in the context of environmental law, hasn't it been your experience that most are settled? Yes. In fact, that's the desired outcome. Right. Okay. Given that fact, how would one measure success for purposes of e-job in this area? Okay. At the most global level, this is the first time anyone had ever obtained any mitigation beyond what the Navy was willing on its own to do with respect to mid-frequency active sonar. Now, mid-frequency active sonar is the principal submarine detection system that our Navy uses. They do not, like anyone else, tell you how to use it. It's an extraordinarily difficult hill to climb in order to get any changes in that. And I think we've not only seen it, but the National Marine Fisheries Service, which is part of the U.S. government, sees that every time. So this is the first time, first case ever, where anyone has ever achieved mitigation on mid-frequency sonar beyond what the Navy was willing to do. And this is important, as I said, not just as it related to RIMPAC in terms of more monitoring, visual, airplanes, passive acoustic monitoring, geographic exclusions from the newly created Northwest Hawaiian Islands National Marine Monument, a 25-mile buffer zone around that area, a prohibition against using sonar in transit between exercises. They've always said, we have to use this wherever we want. And NIMF said, well, we want you to commit that you'll only use it in the planned exercises because this is, after all, training. This is not actual combat. And the Navy said, no. And this is in the record where they specifically say it, and I think it's SCR-124. So we were able to get them to commit that they would stop using it in transit between these. And that was a very significant concession as well. So what you're saying is that certainly in this case, this was, you got a unique victory, and under the terms of this case, maybe that's all we can do. Well, let me put it this way. But I'm looking for a little more global sense of what constitutes success. We get these cases, as you know, in many contexts. We get them in connection with, to some degree, actions involving the federal government where you get all kinds of cross appeals, and somebody gets a little bit of here, and they don't get that, and they all claim fees. And we have to examine them in that context. I'm looking for some light and clarification in the environmental area, which is an area dear to your heart, to understand what constitutes success. Yes. So I would define it at a couple of levels. I would say in terms of the actual effect on the environment in the area affected by the sonar use, which is RIMPAC 2006, waters around Hawaii, there were a number of very specific improvements that we were able to obtain. More broadly than that, there is no question that this is a technology that the Navy uses not just in Hawaii, not just in the waters of the U.S., but around the world. And we have been working very diligently, along with our colleagues at the IRL law firm, to force the Navy to use this technology wherever it uses it in a more environmentally responsible way. So if you take, for example, the Southern California exercises, which are the subject of another NRDC v. Winter case. It's gone up all the way through this court. The refusal of the Navy in that context to agree even to use the RIMPAC mitigation measures has something that was cited by the district judge. It was cited repeatedly by several panels in the Ninth Circuit. And we cite it because it establishes a precedent for how this technology can be used in a safer way, so that when they train, they do less harm. Now, the Navy doesn't like that. Precedent is something. They want to be able to use it any way they see fit. So this was, I think, a very important aspect of success from this litigation. And so we take issue in the strongest terms with the attempts now by the Navy and by their counsel to denigrate what was a very, very hard-fought victory in the RIMPAC case. But not just a victory in a selfish sense for us. It's a victory because it is moving the Navy in the direction of using this technology in a way that does less harm. Can I turn your attention for a minute, please, Mr. Reynolds, to the Cummings and Circuit Rule 39.1.6 issue? What's your response to that? I was going to say I'm prepared to rest on the brief on that, because I think 20th century deals with that. It is dispositive. And this idea that we just heard again a few minutes ago, that 20th Century Fox was not on point, is simply belied by the language of the case. The Ninth Circuit in that case addressed directly the issue that's being addressed here, which is do these circuit rules by their terms deprive the district court of jurisdiction to award fees for time spent litigating in the Court of Appeals? And I would refer your honors to 429F3-884, where the court explicitly cites the argument. Relying heavily on Circuit Rules 39.1.6 and 39.1.8, Dastar contends that the district court was without jurisdiction. That's the argument that's being made here. And 20th Century essentially said, no, the district court did not abuse its discretion in doing that. And I think it's sensible. I mean, how ridiculous would it be for, as an example in this particular, the RIMPAC situation, where the district court would force us to go up to the Ninth Circuit, file a whole motion up here over a limited period of time that was just part and parcel of the overall district court litigation? So, in effect, what you're saying is that 28 U.S.C. 2112 needs to be construed in a way that whatever the circuit rule says, that it trumps the circuit rule. Well, it really doesn't matter what I say. No, I understand. It's what the Ninth Circuit has already said. And I think in 20th Century Fox, that's about as clear a slam dunk as you'll come across in this business. Counsel, can I turn? I would like to turn back to the question of the rates. With respect to Mr. Jasny, your declaration says that the $250 an hour was commensurate with that of pre-bar summer associates. It appears to me that the district court took the request for other summer associates from, I believe they requested about $220 an hour to $100 an hour. How do we get to $220 an hour for Mr. Jasny, who's not a member of the bar? Well, the application on his behalf was made as were the rates for all of the counsel in this case, based on affidavits. I understand that. I've read the affidavits. And he's wonderfully well qualified. He's just simply not a member of the bar. Now, are you requesting a consultant's fee for him? Because I understood that your declaration said we've picked the fee that we think that summer associates are going to be billed at, and the fee that you selected was very similar to the fee that Arella Manella designated for their summer associates. But I'm looking at the district court's order. It looks like the district court knocked the summer associate fees that were requested, I believe, at $220 to $100 an hour. Well, in the case of Mr. or Ms. Vitergas. Here's the difference. One is a summer associate, and one is a first-year associate. And that's the difference. Okay. Vitergas is a summer associate. Yes. And Jasney is listed as an attorney on that order. Well, that's the category. This is the district court's order. Yes. So this is clearly wrong. It's clearly wrong in terms of designating him as an attorney because you're not an attorney until you pass the bar. Right. And what I'm trying to match up here is that in your affidavit, you said that the rates that you were requesting for him were those that were comparable for summer associates. If that is true, which was your statement, then shouldn't that rate be reduced to a summer associate rate, which is what the district court did for Mr. and Ms. Vitergas, whoever he or she was? I would say, Your Honor, that if Mr. Jasney were equivalent to a summer associate, that he should be reduced. But the fact of the matter is he is ‑‑ and our intention was to have him treated as someone who was a first-year associate. And that's the scale that we used was the one from Ireland. I'm not questioning his credentials in the least. He's extraordinarily well qualified for what he was engaged in, but he is not a member of the bar. That is correct. So the intention, Your Honor, and if there was some miscommunication of that, and I'll take your word for it that there may have been, the intention was that Ms. Vitergas was to be treated as a summer associate and Mr. Jasney was to be treated as a pre-bar first-year associate. And that would be the distinction between the rates charged. The last point I would make, and my time has just about expired, is ‑‑ Actually, it has expired. Oh, okay. I will simply say Judge Cooper, I think, who did a really masterful job on this, actually reduced our application by 25 percent. So I thank you for your attention. Thank you, Mr. Reynolds. Ms. Kovacs, did you reserve some time? I think I did, Your Honor. A little bit over three minutes. Just a few quick points, Your Honor. First, on the enhanced fee question, we don't dispute that they needed a team of lawyers to handle this case on a short timeframe. But as I said in my opening remarks, they did not meet their burden of showing that they needed an entire team of experts. Mr. Reynolds did not even address that point, which comes under the second prong. How do we possibly, from our perspective now, judge how many attorneys is too many? Well, in this case, certainly having two, I don't think they needed any environmental experts in this case, but certainly having two. How many DOJ attorneys worked on this or Navy attorneys worked on this? Actively, there were quite a few. There's 17 people who had their thumb on it at one point. And they all came from the Environmental and Natural Resources Department? I think, actually, there were a few people here at the U.S. Attorney's Office who simply filed papers for us. There was the Assistant Attorney General who basically does nothing except that her thumbprint has to go on. Don't quote me on that. I can't believe I said that live in court. But she's the Assistant Attorney General. She's always spoken highly of you. She did. I know. I feel terrible that I just said that about her. But she doesn't do any active work on the case. It's just that her name has to go on the brief and so on. So we don't contest that they needed a team of lawyers. What they didn't need, and they don't even attempt to, they don't even address this issue in their brief or in court, they didn't need eight practice specialists in environmental law. On the first prong of the Pierce test, there's no question that their experience in what we call NRDC-1 gave them some familiarity with the facts and the basic precepts of law. But it wasn't sufficient to constitute a practice specialty. I refer the court in particular to the discussion in Pierce at pages 571 to 572 where the court says that the special factor exception can't just mean that experienced enough lawyers are in short supply because the supply is what determines the market rate. I refer the court to that discussion in Pierce. We discuss Mr. Kendall's experience in our brief. I won't go into that now. But basically, in addition to NRDC-1, he had only one other case in environmental law more than 12 years ago that he participated in for four weeks. That is not enough to be a practice specialty. But to some degree, what was done here was just civil litigation. And they had a significant expertise in that. They were experts in that. I actually agree. All the members of the team have to have environmental expertise as long as, if you need, say, two different types of attorneys. One is a specialist in civil litigation. One is a subspecialist in environmental litigation. Can't they work together to achieve the common objective? I mean, obviously, these are not tender feet for the most part. These are people who are serious, experienced people. They worked very hard over a holiday weekend. The government worked really hard. You have these two titans going back and forth. What's wrong with that? This court has never held that civil litigation is a practice specialty that gets enhanced fees. That would be very dramatic, that this court, in line with Pierce, has always held that there needs to be a practice specialty like Social Security law, immigration law, environmental law. Civil litigation is not a practice specialty. I agree. This was a run-of-the-mill. In my view, this was a run-of-the-mill Administrative Procedure Act case that required no particular expertise. But even if it did, they had their experts. They had Mr. Reynolds and Mr. Wessler. Does California State Bar have some certified specialists in this type of thing? Is there? Maybe not. I don't know what the State Bar has, but this court has certainly never held. And it would be huge to hold that civil litigation is a practice specialty. It would be deeply in conflict with Supreme Court precedent. I would like, if I can, to just talk about the degree of success very briefly to answer questions. You're quite over your time. If there's something that we absolutely positively have to hear, I'll allow you to say that. The only two things I think you'd absolutely positively have to hear is, if you want to look at the success of the settlement subjectively, I realize it was very meaningful to NRDC. From my client's perspective, it was a success for us. Because as I demonstrated in the brief and as they did not contest in their brief, it really didn't do much beyond what was already required. And just one other point. Your Honor, Judge Smith said that most environmental cases settle. I think that that's true for pollution cases, in my experience, and almost all of the environmental cases against the government come through the Environment Division. How about forest cases? Forest services. How about dam cases? How about salmon cases? Let's not talk about forest service cases. Natural resources cases, the government wins the majority of the cases that are brought against us. I think in most of those cases that we lose, the plaintiffs often don't seek fees because of the substantial burden. You obviously don't work for the Forest Service. I do. We handle all of these cases together. But I think in a lot of cases they don't even request fees. And then in another huge portion, we manage to settle on the fees. Last point, the Court can certainly read 20th Century Fox. It did not decide this issue. The holding in Cummings is in black and white at the very end of the Court's opinion, and it is binding circuit precedent on the appellate fee issue. Thank you so much for your time, Your Honor. We thank both counsel for the argument. NRDC v. Winter.
judges: Bybee, Smith, Canby